1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    SAFARI CLUB INTERNATIONAL, et al.          No.  2:22-cv-01395-DAD-JDP

12                  Plaintiffs,

13          v.                                    ORDER DENYING PLAINTIFFS' MOTION
                                                  FOR A PRELIMINARY INJUNCTION
14    ROB BONTA, in his official capacity as
      Attorney General of the State of California, (Doc. No. 13)
15
                    Defendant.
16

17

18          This matter came before the court on December 20, 2022, for a hearing on the motion for

19    a preliminary injunction filed on October 21, 2022 on behalf of plaintiffs Safari Club

20    International, the United States Sportsmen's Alliance Foundation, and the Congressional

21    Sportsmen's Foundation ("plaintiffs"),[1] seeking injunctive and declaratory relief against

22    defendant Rob Bonta, in his official capacity as Attorney General of the State of California

23    ("defendant").  (Doc. No. 13.)  Attorneys Michael B. Reynolds and Cameron Schlagel appeared

24    at the hearing by video on behalf of plaintiffs.  Deputy Attorney General Gabrielle Boutin

25    appeared at the hearing by video on behalf of defendant.  For the reasons explained below, the

26

27    ───────────────────
      [1]  So Cal Top Guns, Inc. had been a named plaintiff in the originally filed complaint but was
28    terminated from this action after it was omitted as a plaintiff from the operative first amended
      complaint ("FAC").  (Doc. Nos. 1, 12, 15.)

                                                    1

1    court will deny plaintiffs' motion for a preliminary injunction.

2                              **BACKGROUND**[2]

3          Plaintiffs, three sportsmen advocacy organizations, bring several constitutional challenges

4    to a recently enacted California statute that prohibits firearm industry members from advertising

5    or marketing firearm-related products in a manner that is designed, intended, or reasonably

6    appears to be attractive to minors.

7          On June 30, 2022, after passing both houses of the California state legislature, Governor

8    Gavin Newsom signed into law Assembly Bill ("AB") 2571, which went into effect immediately.

9    (Doc. Nos. 12 at ¶ 55; 14-1 at 2.)[3]  A month later, on August 31, 2022, the state legislature passed

10   AB 160, a public safety trailer bill that included, among other things, amendments to AB 2571.

11   (Doc. Nos. 12 at ¶ 56; 14-2 at 2, 4–6.)  Governor Newsom signed AB 160 into law on September

12   29, 2022, and it took effect immediately.  (Doc. No. 14-2 at 2.)  The resulting statute—California

13   Business & Professions Code § 22949.80—provides that "[a] firearm industry member shall not

---

14   [2]  The following facts are drawn from the allegations of the FAC, the exhibits to plaintiffs'
15   request for judicial notice and defendant's request for judicial notice, and the exhibits to
     declarations filed in support of and in opposition to the pending motion.  (Doc. Nos. 12, 13, 14,
16   17-1, 17-2.)

17   [3]  In conjunction with the pending motion, plaintiffs and defendant filed their own requests for
18   judicial notice.  (Doc. Nos. 14, 17-1.)  Plaintiffs request judicial notice of the following
     documents:  (1)  a copy of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022); (2) a copy of AB 160,
19   2021–2022 Reg. Sess. (Cal. 2022); and (3) a copy of the Sen. Judiciary Comm., B. Analysis of
     AB 2571, 2021–2022 Reg. Sess. (Cal. 2022).  (Doc. Nos. 14-1, 14-2, 14-3.)  Defendant requests
20   judicial notice of the following documents:  (1) a copy of the Assemb. Comm. on Priv. &
     Consumer Prot., B. Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022); (2) Assemb.
21   Judiciary Comm., B. Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022); (3) Assemb.
     Appropriations Comm., B. Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022); (4) Assemb.
22   Floor Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022); (5) Sen. Judiciary Comm., B.
     Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022): (6) Sen. Appropriations Comm., B.
23   Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022): (7) Sen. Rules Comm., Senate Floor
     Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022); (8) Concurrence in Senate Amend., Bill
24   Analysis of AB 2571, 2021–2022 Reg. Sess. (Cal. 2022).  (Doc. No. 17-1.)  Having reviewed
     both requests for judicial notice, which neither party opposes, the court finds that all of the
25   foregoing documents are the proper subject of judicial notice and thus grants plaintiffs' and
     defendant's respective requests.  *See* Fed. R. Evid. 201(b)–(c); *Anderson v. Holder*, 673 F.3d
26   1089, 1094 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice."); *City &
27   Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1083 n.3 (9th Cir. 2022) (taking judicial notice
28   of a document obtained from an official government website).

1  advertise, market, or arrange for placement of an advertising or marketing communication

2  offering or promoting any firearm-related product in a manner that is designed, intended, or

3  reasonably appears to be attractive to minors."  Cal. Bus. & Prof. Code § 22949.80(a)(1).

4        On August 5, 2022, plaintiffs initiated this action against defendant seeking an order

5  declaring § 22949.80 unconstitutional, on its face and as applied to them, and enjoining its

6  enforcement.  (Doc. No. 1 at ¶ 2.)  On October 18, 2022, plaintiffs filed their operative FAC,

7  asserting claims for:  (1) violation of their right to freedom of speech under the First Amendment;

8  (2) violation of the right to commercial speech under the First Amendment; (3) violation of their

9  rights to association and assembly under the First Amendment; and (4) violation of the

10 overbreadth doctrine under the First Amendment; (5) violation of the Fifth and Fourteenth

11 Amendments because the provision is void for vagueness; and (6) violation of the Equal

12 Protection Clause under the Fourteenth Amendment.  (Doc. No. 12 at ¶¶ 98–176.)

13       On October 21, 2022, plaintiffs filed the pending motion for a preliminary injunction

14 seeking to enjoin the enforcement of § 22949.80.  (Doc. No. 13.)  On November 4, 2022,

15 defendant filed his opposition to the pending motion (Doc. No. 17), and on November 14, 2022,

16 plaintiffs filed their reply thereto (Doc. No. 18).

17 **A.     AB 2571, AB 160, and California Business and Professions Code § 22949.80**

18       In enacting AB 2571, the state legislature stated that its intent was to "further restrict the

19 marketing and advertising of firearms to minors."  (Doc. No. 14-1 at 4.)  In doing so, the state

20 legislature made the following findings and declarations:

21            The Legislature hereby finds and declares that the proliferation of
             firearms to and among minors poses a threat to the health, safety,
22            and security of all residents of, and visitors to, this state.  These
             weapons are especially dangerous in the hands of minors because
23            current research and scientific evidence shows that minors are more
             impulsive, more likely to engage in risky and reckless behavior,
24            unduly influenced by peer pressure, motivated more by rewards
             than costs or negative consequences, less likely to consider the
25            future consequences of their actions and decisions, and less able to
             control themselves in emotionally arousing situations.    In
26            recognition of these facts, the Legislature has already prohibited
             minors from possessing firearms, except in certain limited
27            circumstances.  Nonetheless, firearms manufacturers and retailers
             continue to market firearms to minors, often identifying particular
28            weapons as starter guns, especially good for children.  As reflected

3

1
2
3
4
5
6

in numerous laws regulating marketing of dangerous products to minors, children are especially susceptible to marketing appeals, as well as more prone to impulsive, risky, thrill-seeking, and violent behavior than other age groups. Firearms marketing contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully. This state has a compelling interest in ensuring that minors do not possess these dangerous weapons and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons.

7   (*Id.* at 2–3.)

8       AB 2571 added Chapter 39 "Marketing Firearms to Minors" to the California Business

9   and Professions Code, commencing with § 22949.80. (Doc. No. 14-1 at 2–3.) In its original

10  form, § 22949.80 established that "[a] firearm industry member shall not advertise, market, or

11  arrange for placement of an advertising or marketing communication *concerning* any firearm-

12  related product in a manner that is designed, intended, or reasonably appears to be attractive to

13  minors." (*Id.* at 2) (emphasis added). When the statute was amended by AB 160, the word

14  "concerning" was replaced with the language "offering or promoting." (Doc. No. 14-2 at 4.) The

15  statute also seeks to protect minors' personal information by generally prohibiting firearm

16  industry members from collecting, using, or disclosing a minor's personal information for the

17  purpose of advertising or marketing firearm-related products, or allowing a third party to do so.

18  *See* Cal. Bus. & Prof. Code § 22949.80(b).

19      Section 22949.80 defines certain terms used in the statute, including "firearm industry

20  member," "firearm-related product," "attractive to minors," and "marketing or advertising." *Id.* §

21  22949.80(a)(2), (c). First, a "firearm industry member" has two alternative definitions. *Id.* §

22  22949.80(c)(4). It means "[a] person, firm, corporation, company, partnership, society, joint

23  stock company, or any other entity or association" that is either (a) "engaged in the manufacture,

24  distribution, importation, marketing, wholesale, or retail sale of firearm-related products"; or (b)

25  "formed for the express purpose of promoting, encouraging, or advocating for the purchase, use,

26  or ownership of firearm-related products that does one of the following:" (i) "[a]dvertises

27  firearm-related products"; (ii) "[a]dvertises events where firearm-related products are sold or

28  used"; (iii) "[e]ndorses specific firearm-related products"; or (iv) "[s]ponsors or otherwise

4

promotes events at which firearm-related products are sold or used." *Id.*

Next, a "firearm-related product" is defined as "a firearm, ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a firearm accessory" meeting any one of the following four conditions:  (i) "[t]he item is sold, made, or distributed in California"; (ii) "[t]he item is intended to be sold or distributed in California"; (iii) "[i]t is reasonably foreseeable that the item would be sold or possessed in California"; or (iv) "[m]arketing or advertising for the item is directed to residents of California."  *Id.* § 22949.80(c)(5).

The definition of "marketing or advertising" was also modified through amendment.  AB 2571 originally defined "marketing or advertising" to mean "in exchange for monetary compensation, to make a communication to one or more individuals, or to arrange for the dissemination to the public of a communication, about a product *or service* the primary purpose of which is to encourage recipients of the communication to *purchase or use the product or service*."  (Doc. No. 14-1 at 4) (emphasis added).  However, AB 160 amended this definition by deleting reference to "or service" entirely and by replacing the phrase "purchase or use the product or service" with the language "engage in a commercial transaction."  (Doc. No. 14-2 at 4–6.)  Thus, the statute, in its current form, defines "marketing or advertising" to mean, "in exchange for monetary compensation, to make a communication to one or more individuals, or to arrange for the dissemination to the public of a communication, about *a product*, the primary purpose of which is to encourage recipients of the communication to *engage in a commercial transaction*."  Cal. Bus. & Prof. Code § 22949.80(c)(6) (emphasis added).

To determine "whether marketing or advertising of a firearm-related product is attractive to minors,"[4] as prohibited in § 22949.80(a)(1), the statute provides that "a court shall consider the totality of the circumstances."  *Id.* § 22949.80(a)(2).  The statute then lists six relevant factors to be considered, including, but not limited to, whether the marketing or advertising in question:

> (A) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.

---

[4]  The statute defines a "minor" as "a natural person under 18 years of age who resides in this state."  Cal. Bus. & Prof. Code § 22949.80(c)(7).

(B) Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals, that promotes a firearm industry member or firearm-related product.

(C) Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors.

(D) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.

(E) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

(F)  Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

*Id.*

The statute also establishes an enforcement mechanism.  *See id.* § 22949.80(e).  Any person who violates § 22949.80 "shall be liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each violation."  *Id.* § 22949.80(e)(1)–(2).  The statute clarifies that "[e]ach copy or republication of marketing or advertising prohibited by this section shall be deemed a separate violation."  *Id.* § 22949.80(e)(6).  The statute and its civil penalties can be enforced through a civil action brought by the California Attorney General or local jurisdictions. *Id.* § 22949.80(e)(1).  A private individual who is "harmed by a violation" can also proceed with a civil action to recover damages incurred, and any prevailing plaintiff can also seek an award of reasonable attorney's fees and costs.  *Id.* § 22949.80(e)(3), (5).  Finally, courts are empowered to order injunctive relief as deemed necessary.  *Id.* § 22949.80(e)(4).

Aside from the two amendments to the statutory text addressed above, AB 160's only other amendment was the creation of subsection (a)(3).  Section 22949.80(a)(3) states that the statute's main advertising prohibition (in subsection (a)(1)), "does not apply to a communication offering or promoting any firearm safety program, hunting safety or promotional program, firearm instructional course, sport shooting event or competition, or any similar program, course, or event."  *Id.* § 22949.80(a)(3).  "[N]or does it apply to a communication offering or promoting membership in any organization, or promotion of lawful hunting activity, including, but not limited to, any fundraising event, youth hunting program, or outdoor camp."  *Id.*

Lastly, § 22949.80 includes a severability clause, which states that "[t]he provisions of this section are severable.  If any portion, subdivision, paragraph, clause, sentence, phrase, word, or application of this section is for any reason held to be invalid by any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this chapter."  *Id.* § 22949.80(f).

**B.   Plaintiffs**

The three plaintiffs who have brought this action are identified and described, in their own words, below.  (Doc. No. 12 at ¶¶ 17–43.)

    1.    Plaintiff Safari Club International

Plaintiff Safari Club International ("SCI") is a nonprofit Internal Revenue Code § 501(c)(4) corporation incorporated in Arizona, headquartered in Washington, D.C., but founded in Los Angeles, California.  (Doc. No. 12 at ¶ 25.)  SCI has approximately 45,000 members and 200 chapters throughout the United States, including nine chapters in California constituting 10 percent of SCI's members.  (*Id.*)  SCI's mission is to protect the freedom to hunt and to promote wildlife conservation worldwide.  (*Id.* at ¶ 26.)  It does this through public information and education, including by supporting education programs on wildlife conservation, ecology, and natural resource management.  (*Id.*)  SCI also "prides itself for being a leader in educating elected officials and policymakers on the essential role of hunting in science-based management of wildlife and habitat."  (*Id.*)  Its membership includes "youth memberships" to whom SCI provides programs and resources to educate youth on the role of hunting in the management and conservation of wildlife.  (*Id.* at ¶ 27.)  SCI also publishes three magazines and journals distributed across the United States, including in California, that allegedly feature, among other things, marketing and advertising "discussing and depicting youth engagement in conservation activities, including hunting with firearms."  (*Id.* at ¶¶ 28–32.)

    2.    Plaintiff the United States Sportsmen's Alliance Foundation

Plaintiff the United States Sportsmen's Alliance Foundation ("Sportsmen's Alliance") is an Ohio nonprofit that is headquartered in Columbus, Ohio and registered in California as an out-of-state nonprofit.  (*Id.* at ¶ 17.)  Sportsmen's Alliance has "thousands of members and donors

nationwide" and "works to protect and advance our nation's outdoor heritage of hunting, fishing, trapping, and shooting in all 50 state legislatures." (*Id.* at ¶ 18.)  In addition, Sportsmen's Alliance organizes, sponsors, and administers youth-oriented conservation programs and courses, including in California.  (*See id.* at ¶¶ 19–22.)  In support of its mission, Sportsmen's Alliances publishes an official magazine called "The Sportsmen's Advocate," which is distributed across the United States, including in California.  (*Id.* at ¶ 23.)  Sportsmen's Alliances publications allegedly "contain marketing and advertising of firearm-related products as well as articles, photographs, and other media discussing and depicting youth engagement in conservation activities, including hunting with firearms and the shooting sports." (*Id.* at ¶ 24.)

        3.      Plaintiff Congressional Sportsmen's Foundation

       Plaintiff Congressional Sportsmen's Foundation ("CSF") is a nonprofit Internal Revenue Code § 501(c)(4) corporation incorporated in Washington, D.C., and registered and licensed as a charity organization doing business in all 50 states.  (*Id.* at ¶ 33.)  CSF's mission is to work with the U.S. Congress, governors, and state legislatures to protect and advance hunting, angling, recreational shooting, and trapping.  (*Id.* at ¶ 34.)  CSF hosts, through its California Outdoor Sporting Caucus, an annual trap and skeet shoot in Davis, California, which is "regularly attended by youth shooting groups" along with legislators and staff.  (*Id.* at ¶ 41.)  CSF also hosts fundraisers in California "that involve firearms and may be attended by minors."  (*Id.* at ¶ 42.)  To advance its mission, CSF publishes a quarterly report and weekly newsletter and regularly promotes its updates on legislation and policy via social media.  (*Id.* at ¶ 43.)  These CSF publications allegedly include marketing and advertising by "firearm industry members . . . discussing and depicting youth engagement in conservation activities, including hunting with firearms and the shooting sports."  (*Id.*)

## C.      Plaintiffs' Alleged Injury

      Plaintiffs filed the pending motion because they purportedly "engage in, or facilitate, a broad range of advertising communications concerning lawful Second Amendment conduct," which they now claim is prohibited under § 22949.80.  (Doc. No. 13 at 13.)  Citing to declarations filed in support of the pending motion, plaintiffs contend that each of them engages in the

following activities that are now purportedly prohibited by § 22949.80:  "publish communications featuring articles and images that depict minors lawfully using firearms and firearm-related products"; "sell space for traditional advertising concerning firearm-related products that California law allows minors to use and possess"; "sell and provide branded merchandise featuring caricatures and cartoons—many of which may appeal to youths and adults—to promote their organizations, solicit membership and other support, and promote pro-Second Amendment messages and ideas"; and "advertise, market, promote, sponsor, and facilitate lawful recreational youth shooting events, educational programs and safety courses, or gun shows where youths are likely to attend."  (Doc. No. 13 at 13–14.)  In addition, plaintiffs argue that the events they are advertising, marketing, promoting, sponsoring, and facilitating "often involve the handling or use of firearms and firearm-related products," "advertising by third parties promoting membership in their organizations," the distribution of branded merchandise, or third parties "engaging in speech promoting the safe and lawful use of firearms."  (*Id.* at 14.)

Due to a fear of liability from the enforcement of § 22949.80's provisions, plaintiffs contend that they have curtailed their constitutionally protected speech.  (*Id.*)

## LEGAL STANDARD

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*, /////

537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by Winter*, 555 U.S. 7).[5]

The party seeking the injunction bears the burden of proof as to each of these elements.   *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## ANALYSIS

**A.      Likelihood of Success on the Merits**

Plaintiffs bear the burden of demonstrating that they are likely to succeed on the merits of their claims or, at the very least, that "serious questions going to the merits were raised."  *All. for the Wild Rockies*, 632 F.3d at 1131.  Here, plaintiffs allege that they are likely to prevail on each of their six facial constitutional challenges to § 22949.80.[6]  (Doc. No. 13 at 15.)

1.      <u>The Right to Free Speech Under the First Amendment (Claims 1 & 2)</u>

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech."  *Nat'l Inst. of Family & Life Advocates v.*

---

[5]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

[6]  Although plaintiffs allege in their FAC that they are challenging § 22949.80 on its face and as applied to them (Doc. No. 12 at ¶ 2), the pending motion for a preliminary injunction appears to assert only a facial challenge to the statute because plaintiffs:  (1) are seeking to enjoin the statute's enforcement in its entirety; (2) state in their pending motion that § 22949.80 is unconstitutional "on its face"; and (3) make no effort to identify specific applications of § 22949.80 as to themselves.  (Doc. No. 13 at 10, 18, 34).  Thus, the court will treat this pending motion for a preliminary injunction as being based upon a facial attack on § 22949.80.  *See United States v. Stevens*, 559 U.S. 460, 472 (2010) ("To succeed in a typical facial attack, [a plaintiff] would have to establish that no set of circumstances exists under which [the statute] would be valid or that the statute lacks any plainly legitimate sweep.") (internal citations and quotations omitted).

10

1   *Becerra*, ___ U.S. ___, 138 S. Ct. 2361, 2371 (2018).  Under the First Amendment, a government

2   "has no power to restrict expression because of its message, its ideas, its subject matter, or its

3   content."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of*

4   *Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  "Content-based laws—those that target speech

5   based on its communicative content—are presumptively unconstitutional and may be justified

6   only if the government proves that they are narrowly tailored to serve compelling state interests."

7   *Id.* (citations omitted).  "Government regulation of speech is content based if a law applies to

8   particular speech because of the topic discussed or the idea or message expressed."  *Id.* (citations

9   omitted).  In other words, "'content based' . . . requires a court to consider whether a regulation of

10  speech 'on its face' draws distinctions based on the message a speaker conveys."  *Id.* (citing

11  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011)).  However, "[t]he Constitution . . .

12  accords a lesser protection to commercial speech than to other constitutionally guaranteed

13  expression," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557,

14  562–63 (1980) ("*Central Hudson*"), and "regulation of commercial speech based on content is

15  less problematic."  *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 65 (1983); *see also Retail*

16  *Digital Network, LLC v. Prieto*, 861 F.3d 839, 844 (9th Cir. 2017).  It follows then, that this court

17  must first determine whether the speech that § 22949.80 seeks to regulate is commercial speech.

18              a.      Whether § 22949.80 Regulates Commercial Speech

19          The core notion of commercial speech is "speech which does 'no more than propose a

20  commercial transaction.'"  *Bolger*, 463 U.S. at 66 (quoting *Va. State Bd. of Pharmacy v. Va.*

21  *Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)).  When determining whether speech

22  can be classified as commercial speech, courts look to whether:  (1) the speech is an

23  advertisement; (2) the speech refers to a particular product; and (3) the speaker has an economic

24  motivation.  *See id.* at 66–68; *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011).

25          To apply these *Bolger* factors in assessing this facial challenge to § 22949.80, the court

26  must interpret the statutory text.  As with all statutory interpretation questions, the court begins

27  with the text itself, and it ends there as well if the text is unambiguous.  *GCIU-Emp. Ret. Fund v.*

28  *MNG Enterprises, Inc.*, 51 F.4th 1092, 1097 (9th Cir. 2022).  "If the statutory language is plain,

                                                 11

1  [the court] must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015).  In

2  doing so, the court "must read the words in their context and with a view to their place in the

3  overall statutory scheme." *Id.* (internal quotations and citations omitted).

4       Having carefully evaluated the text of § 22949.80 and considered the parties' arguments,

5  the court concludes that the speech which § 22949.80 seeks to regulate is commercial speech.

6  The statute's text and purpose support this conclusion.  To begin with, § 22949.80's title

7  ("Marketing Firearms to Minors") and stated purpose ("to further restrict the marketing and

8  advertising of firearms to minors") indicate that it is aimed specifically at regulating profit-

9  motivated speech.  (Doc. No. 14-1 at 3); *see also Marketing*, Black's Law Dictionary (11th ed.

10  2019) ("The act or process of promoting and selling, leasing, or licensing products or services.").

11       The rest of the statute is consistent with its prefatory text.  The thrust of § 22949.80

12  reflects that it is aimed at regulating for-profit speech because it applies to "industry members"

13  who "advertise, market, or arrange for placement of an advertising or marketing communication

14  offering or promoting" a particular type of product—i.e., a "firearm-related product."  Cal. Bus.

15  & Prof. Code § 22949.80(a)(1).  The statute's definitions further support this financially-driven

16  reading.  For instance, "marketing or advertising" is defined as a "communication" "about a

17  product" that is made "in exchange for monetary compensation" which has "the primary purpose

18  of . . . encourag[ing] recipients of the communication to engage in a commercial transaction." *Id.*

19  § 22949.80(c)(6).  In addition, when comparing the statutory definition of "firearm-related

20  product" to the commonplace meaning of "product," it is apparent that the former definition falls

21  within the latter.  *Compare* Cal. Bus. & Prof. Code § 22949.80(c)(5) (defining "firearm-related

22  product" to mean a firearm (or a part, component, or accessory thereof) or ammunition that is to

23  be sold, made, or distributed in California) *with Product*, Black's Law Dictionary (11th ed. 2019)

24  ("Something that is distributed commercially for use or consumption and that is usu. (1) tangible

25  personal property, (2) the result of fabrication or processing, and (3) an item that has passed

26  through a chain of commercial distribution before ultimate use or consumption.").  As such, the

27  speech which falls within § 22949.80's purview is communications offering or promoting certain

28  products whose speakers have paid money to disseminate, and the primary purpose of those

1   communications is to encourage recipients "to engage in a commercial transaction."  Cal. Bus. &

2   Prof. Code § 22949.80(c)(6); *see Bolger*, 463 U.S. at 66–68 (concluding that informational

3   pamphlets mass-mailed by a contraceptives manufacturer were properly characterized as

4   commercial speech because the pamphlets contained advertisements regarding a specific product

5   sent by the manufacturer of that product "notwithstanding the fact that they contain[ed]

6   discussions of important public issues such as venereal disease and family planning").

7          In their pending motion, plaintiffs contend that § 22949.80 seeks to prohibit

8   advertisements that are "inextricably intertwined with core political and economic messages" and

9   therefore should be subject to heightened scrutiny.  (Doc. No. 13 at 20–21) (citing *Valle Del Sol*

10  *Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013)).  However, in *Whiting*, the Ninth Circuit

11  specifically rejected an argument by day laborers that a law restricting the solicitation of their

12  services by passerby motorists regulated core political speech because, the day laborers

13  contended, their message was "inextricably intertwined" with their commercial speech of

14  soliciting work.  *Whiting*, 709 F.3d at 818–19 ("The district court correctly concluded that the day

15  laborer provisions restrict only commercial speech.")

16         Here, § 22949.80 states that it regulates speech, "the primary purpose of which is to

17  encourage recipients of the communication to engage in a commercial transaction," and, thus, it

18  does not include any core political speech on its face.  *See Whiting*, 709 F.3d at 819 ("The act of

19  soliciting work as a day laborer may communicate a political message, but the primary purpose of

20  the communication is to advertise a laborer's availability for work and to negotiate the terms of

21  such work.").  Plaintiffs in this case have failed to explain how political speech regarding firearms

22  is "intertwined" with the commercial speech that § 22949.80 is regulating, except to state in

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

13

1  conclusory fashion that there is "no question" that it is intertwined.[7]  (Doc. No. 18 at 6.)

2  Obviously this does not make it so.  Moreover, "[i]mplicit in this standard . . . is that where the

3  two components of speech can be easily separated, they are not 'inextricably intertwined.'"  *Hunt*,

4  638 F.3d at 715.  Thus, even if the speech regulated here was intertwined with political speech,

5  plaintiffs have not shown that such speech is inextricably bound up in a manner that it cannot be

6  separated.  *See Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) (finding that

7  the commercial speech of selling Tupperware at "Tupperware parties" was not "inextricably

8  intertwined" with the fully protected speech discussed at those parties because "[n]othing . . .

9  prevents the speaker from conveying, or the audience from hearing, these noncommercial

10  messages, and nothing in the nature of things requires them to be combined with commercial

11  messages").  Indeed, commercial speech can retain its character notwithstanding the fact that it

12  contains "discussion of important issues."  *Id.* at 475 ("We have made clear that advertising

13  which 'links a product to a current public debate' is not thereby entitled to the constitutional

14  protection afforded noncommercial speech.") (citation omitted).

15       Because § 22949.80 targets profit-motivated advertisements regarding firearm-related

16  products, all the unmistakable signs of commercial speech are present.  Accordingly, the court

17  concludes that § 22949.80 regulates commercial speech.  *See Junior Sports Mags. Inc. v. Bonta*,

18  No. 2:22-cv-04663-CAS-JC, 2022 WL 14365026, at *12 (C.D. Cal. Oct. 24, 2022) ("[T]he Court

19

20  [7]  At the hearing on the pending motion, plaintiffs contended that speech regulated by § 22949.80
   is inherently connected to speech pertaining to the Second Amendment.  This line of argument
21  was also present in plaintiffs' pending motion wherein they contended that the Supreme Court has
   struck down advertising bans of contraceptives, in part, because the information being suppressed
22  concerned activity that the state could not, at least in some respects, interfere with because it was
   constitutionally protected.  (Doc. No. 13 at 20) (citing *Carey v. Population Servs. Int'l*, 431 U.S.
23  678, 700–01 (1977) and *Bolger*, 463 U.S. at 69).  As such, plaintiffs argue that the "same
   heightened constitutional protection" extends to lawful possession and use of firearms as
24  provided for in the Second Amendment.  (*Id.* at 21.)  However, in *Carey* and *Bolger* the Supreme
   Court did not apply any heightened level of scrutiny beyond the *Central Hudson* commercial
25  speech test.  *See Bolger*, 463 U.S. 68–69; *Carey*, 431 U.S. at 700–01.  In fact, in *Bolger*, the
   Supreme Court noted that it had "made clear that advertising which 'links a product to a current
26  public debate' is not thereby entitled to the constitutional protection afforded noncommercial
27  speech."  *Bolger*, 463 U.S. at 68 (quoting *Central Hudson*, 447 U.S. at 563 n.5).  Accordingly, the
   court finds this argument advanced by plaintiffs unavailing.
28

1  concludes that [§ 22949.80] . . . is properly read as only applying to commercial speech."), *appeal*

2  *filed* (Nov. 22, 2022).  Because § 22949.80 is limited to regulating commercial speech, plaintiffs

3  have failed to establish a likelihood of success on the merits of their political and ideological right

4  to free speech claim.  (Doc. No. 12 at ¶¶ 98–113.)

5              b.       *Whether the Commercial Speech Regulated By § 22949.80 Is Protected*

6                       *Under the First Amendment*

7        Plaintiffs next raise a facial challenge to § 22949.80 as violating the First Amendment's

8  commercial speech doctrine.  (Doc. No. 13 at 10, 22–30.)

9        The Supreme Court has described a four-part test for analyzing the lawfulness of

10 restrictions on commercial speech as follows:

11            At the outset, we must determine whether the expression is
              protected by the First Amendment.  For commercial speech to come
12            within that provision, it at least must concern lawful activity and
              not be misleading.  Next, we ask whether the asserted governmental
13            interest is substantial.  If both inquiries yield positive answers, we
              must determine whether the regulation directly advances the
14            governmental interest asserted, and whether it is not more extensive
              than is necessary to serve that interest.

15

16 *Central Hudson*, 447 U.S. at 566.  "The *Central Hudson* analysis is commonly referred to as

17 'intermediate scrutiny.'"[8]  *Retail Digital Network*, 861 F.3d at 844.  Here, the parties disagree

18

19 [8]  As an initial matter, plaintiffs contend that there are "two different tests for commercial
   speech," the first involving "heightened scrutiny" under *Sorrell v. IMS Health Inc.*, 564 U.S. 552
20 (2011) and the second being "the commercial speech test articulated in" *Central Hudson*.  (Doc.
   No. 13 at 21.)  The court rejects plaintiffs' contention that "heightened scrutiny" for any
21 commercial speech restrictions is required under *Sorrell* because it is bound by Ninth Circuit
   precedent to the contrary.  Indeed, the Ninth Circuit has considered whether *Sorrell*
22 "fundamentally altered the *Central Hudson* test by adopting a more demanding standard for
   assessing restrictions on commercial speech" and concluded that it did not.  *Retail Digital*
23 *Network*, 861 F.3d at 841 ("We hold that *Sorrell* did not modify the *Central Hudson* standard.");
   *see also Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1198 n.3 (9th Cir.
24 2016) ("[A]lthough laws that restrict only commercial speech are content based, such restrictions
   need only withstand intermediate scrutiny.") (internal citation omitted).  When plaintiffs' counsel
25 was questioned regarding the Ninth Circuit's holding in *Retail Digital Network* at the hearing on
   the pending motion, he essentially conceded its applicability and suggested that the court move on
26 to other topics that would be more useful to its analysis.  The court will therefore proceed by
   applying the *Central Hudson* test—i.e., intermediate scrutiny—in considering plaintiffs'
27 challenge to § 22949.80.

28

15

1   regarding the application of each aspect of the *Central Hudson* test.

2                    i.          Does § 22949.80 Regulate Non-Misleading Speech Concerning

3                                Lawful Activity?

4          To qualify for First Amendment protection, the commercial speech at issue must not be

5   misleading or concern unlawful activities.  *See Central Hudson*, 447 U.S. at 566.  "[W]hen the

6   particular content or method of the advertising suggests that it is inherently misleading or when

7   experience has proved that in fact such advertising is subject to abuse, the States may impose

8   appropriate restrictions."  *In re R. M. J.*, 455 U.S. 191, 203 (1982) ("Misleading advertising may

9   be prohibited entirely."); *see also Central Hudson*, 447 U.S. at 563–64 ("[T]here can be no

10  constitutional objection to the suppression of commercial messages that do not accurately inform

11  the public about lawful activity.").  However, "the States may not place an absolute prohibition

12  on certain types of potentially misleading information, e.g., a listing of areas of practice [for

13  professional services], if the information also may be presented in a way that is not deceptive."  *In*

14  *re R. M. J.*, 455 U.S. at 203.

15         In their pending motion, plaintiffs argue that § 22949.80, "on its face," restricts a broad

16  range of truthful speech concerning lawful activity, including "an offer to sell firearms or

17  ammunition," which they contend is constitutionally protected commercial speech.  (Doc. No. 12

18  at 24).  Plaintiffs also assert that § 22949.80 prohibits their own communications promoting

19  events and programs depicting minors handling or using "firearm-related products," as well as

20  speech regarding "firearm accessories," which minors are, according to plaintiffs, not prohibited

21  from purchasing.  (*Id.*)  Plaintiffs further argue that because state law permits minors to possess

22  and use firearms under certain circumstances with adult supervision, commercial speech

23  regarding those lawful activities cannot be deemed misleading or unlawful.  (*Id.* at 25.)

24         Defendant counters that § 22949.80 regulates commercial speech not protected by the

25  First Amendment because it is unlawful for minors to purchase firearms, and "illegal to loan or

26  transfer any firearm to a person under 21 years of age, subject to narrow exceptions."  (Doc. No.

27  17 at 15.)  In addition, defendant contends that state law "generally prohibits a minor from

28  possessing a handgun, a semiautomatic centerfire rifle, and, as of July 1, 2023, any firearm."  (*Id.*)

It follows, defendant argues, that it is inherently misleading to advertise the sale of products to an audience that is legally barred from purchasing the product that is advertised.  (*Id.* at 16.)  To the extent that state law permits a minor to possess a gun, defendant contends that each lawful circumstance is "quite narrow and carefully circumscribed," and adult supervision or permission is required in some form.  (*Id.* at 15–16.)

Here, the court finds that it is likely that § 22949.80 regulates some commercial speech that is not misleading and which concerns certain lawful activities involving minors and firearms. To be sure, § 22949.80 does prohibit commercial speech regarding unlawful activities—i.e., to the extent it restricts advertising encouraging minors to purchase a firearm or ammunition or otherwise obtain or possess a firearm or ammunition without parental consent, that would constitute commercial speech promoting unlawful activity under California law.  *See* Cal. Pen. Code §§ 27505, 29610, 29650.  At the same time, however, California law permits minors to possess firearms in certain circumstances when accompanied by an adult or allowed by the minor's parent through their presence or written consent.  *See* Cal. Pen. Code § 29615.[9] Specifically, California law permits minors to possess firearms when actively engaging in, or in direct transit to or from, "a lawful, recreational sport," which includes, but is not limited to, "competitive shooting, or agricultural, ranching, or hunting activity or hunting education, or a motion picture, television, or video production, or entertainment or theatrical event, the nature of which involves the use of a firearm."  *Id.* § 29615(a); *see also id.* § 27505(b)(2) (permitting a minor's parent to loan a firearm to their minor child so long as "the duration of the loan does not exceed the amount of time that is reasonably necessary to engage in the lawful, recreational sport").  Thus, the court must determine whether § 22949.80 regulates advertisements depicting instances where a minor may lawfully possess a firearm under California law.

/////

/////

---

[9]  The definition of "firearm" as used in the California Penal Code prohibiting minors from possessing firearms "includes the frame or receiver of the weapon, including both a completed frame or receiver, or a firearm precursor part."  Cal. Penal Code § 16520(b)(15), (18).

17

1    To this end, when § 22949.80 was amended through AB 160, a carve-out was added to the

2    statute exempting many communications regarding lawful firearm activities involving minors.

3    *See* Cal. Bus. & Prof. Code § 22949.80(a)(3).[10]  But despite this amendment to § 22949.80, it

4    appears possible that some speech concerning lawful firearm activities involving minors would

5    nevertheless be swept up within the statute's scope.  For example, an advertisement for a firearm

6    that depicted a minor possessing a firearm while engaged in a recreational sport under parental

7    supervision would not concern unlawful activities or be misleading.  Even if the advertisement

8    was "attractive to minors" who cannot lawfully engage in commercial transactions involving

9    firearms, the advertisement could also be attractive to that minor's parent, who may lawfully

10   purchase a firearm, and who may be receptive to advertisements depicting a parent engaging in a

11   recreational sport involving firearms with their minor child.  *See Educ. Media Co. at Virginia*

12   *Tech v. Swecker*, 602 F.3d 583, 589 (4th Cir. 2010) ("We have recognized that advertisements for

13   age-restricted—but otherwise lawful—products concern lawful activity where the audience

14   comprises both underage and of-age members.").  That same hypothetical advertisement for a

15   firearm would also fall outside of § 22949.80's carve-out because it would not offer or promote

16   "any firearm safety program, hunting safety or promotional program, firearm instructional course,

17   sport shooting event or competition, or any similar program, course, or event"—rather, it would

18   arguably merely promote the sale of a firearm.  Cal. Bus. & Prof. Code § 22949.80(a)(3).  Thus,

19   advertisements depicting minors engaged in "a lawful, recreational sport" but which are not

20   connected to the types of programs, courses, events, and competitions carved out from §

21   22949.80 by its amendment may constitute speech concerning lawful activities that is likely

22   prohibited by the statute.

23   /////

24

25   [10]  The carve-out that was added through AB 160's amendment provides as follows:  "This
     subdivision does not apply to a communication offering or promoting any firearm safety program,
26   hunting safety or promotional program, firearm instructional course, sport shooting event or
     competition, or any similar program, course, or event, nor does it apply to a communication
27   offering or promoting membership in any organization, or promotion of lawful hunting activity,
     including, but not limited to, any fundraising event, youth hunting program, or outdoor camp."
28   Cal. Bus. & Prof. Code § 22949.80(a)(3).

Accordingly, because § 22949.80 may prohibit commercial speech that is not misleading and concerns lawful activities, the court must proceed with the remainder of the four-part *Central Hudson* analysis. *See Junior Sports Mags.*, 2022 WL 14365026, at *16 (finding that § 22949.80 "encompasses commercial speech that may not be misleading or concern unlawful conduct").

ii.        Does the Government Have a Substantial Interest?

In passing AB 2571, the state legislature found that "the proliferation of firearms to and among minors poses a threat to the health, safety, and security of all residents of, and visitors to, this state."  (Doc. No. 14-1 at 2.)  After detailing additional findings about minors, firearms, and marketing, the state legislature declared that "[f]irearms marketing contributes to the unlawful sale of firearms to minors, as well as the unlawful transfer of firearms to minors by adults who may possess those weapons lawfully" and that "[t]his state has a compelling interest in ensuring that minors do not possess these dangerous weapons [i.e., firearms] and in protecting its citizens, especially minors, from gun violence and from intimidation by persons brandishing these weapons."  (*Id.* at 3.)

As defendant argues in his opposition to the pending motion, the state legislature's findings and declarations "are borne out by facts and reports, including those in the legislative record," which has been judicially noticed by this court.  (Doc. No. 17 at 17.)  In addition, defendant has provided, as exhibits attached to counsel's declaration, copies of several primary sources that were referred to by the state legislature in the documents making up the legislative record.  (Doc. No. 17-2.)  According to these materials, in 2020, firearm-related deaths became the leading cause of death for children and adolescents in the United States, overtaking car accidents for the first time.  (Doc. No. 17 at 9) (citing Jason E. Goldstick, Ph.D. et al., *Current Causes of Death in Children and Adolescents in the United States*, 386 New Eng. J. Med. 1955, 1955–56 (2022) ("[T]he increasing firearm-related mortality reflects a longer-term trend and shows that we continue to fail to protect our youth from a preventable cause of death.")).  Defendant also identifies statistics showing that in 2021 "there were approximately 259 unintentional shootings by children, resulting in 104 deaths and 168 injuries," and that, in 2022, "there have been at least 238 unintentional shootings by children . . . resulting in 106 deaths and

145 injuries nationally." (Doc. No. 17 at 17) (citing Doc. Nos. 17-1 at 48; 17-2 at 75–77).

Indeed, as stated in the Senate Judiciary's Committee's bill analysis of AB 2571, not only are children victims of gun violence but also they are often its perpetrators: "the median age of school shooters is 16." (Doc. No. 17-1 at 40, 46.) Finally, plaintiffs do not dispute the government's substantial interest in reducing gun violence. (Doc. No. 18 at 8–9.)

The court concludes that there is ample documentation of the serious and ever-increasing problem of gun violence involving minors, and the state has a substantial interest in addressing that problem. *See Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors."); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 947 (9th Cir. 1997) (holding that the city had "a compelling interest in placing greater restrictions on minors than adults to insure the minors' own safety"); *Junior Sports Mags.*, 2022 WL 14365026, at *16–17 ("Protecting minors and the public broadly from gun violence is a substantial government interest.").

Accordingly, the court concludes that plaintiffs have not carried their burden of showing that they are likely to prevail on their claim that § 22949.80 is not appropriately aimed at a substantial governmental interest.

iii.     Does § 22949.80 Directly Advance the Government's Substantial Interest?

"The third part of the *Central Hudson* test asks whether the speech restriction directly and materially advances the asserted governmental interest." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). "[T]his requirement is critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Id.* (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)). Indeed, the third prong of *Central Hudson* "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). As a result, a commercial speech restriction "cannot be sustained if it 'provides only ineffective or

20

1    remote support for the government's purpose,' . . . or if there is 'little chance' that the restriction

2    will advance the State's goal." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566 (2001)

3    (quoting *Edenfield*, 507 U.S. at 770; *Greater New Orleans*, 527 U.S. at 193).  The government

4    can justify its restriction by reference to studies, anecdotes, history, consensus, or "simple

5    common sense"; it need not rely on empirical data accompanied by excessive background

6    information.  *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995).

7        In their pending motion, plaintiffs principally argue that the state legislature's conclusion

8    that limiting "a broad category of speech promoting firearms . . . will reduce demand for

9    firearms" is speculative.  (Doc. No. 13 at 27–28.)  Plaintiffs further argue that from this demand-

10   dampening conclusion, the state legislature draws another "attenuated" connection between the

11   reduction in demand for firearms with the state's interest in protecting minors from gun violence.

12   (*Id.* at 28.)  Specifically, plaintiffs contend that the state cannot show how this restriction on

13   speech would conceivably affect the unlawful sale or transfer of firearms to minors, as stated in

14   the statute's declarations and findings.  (*Id.* at 28.)

15       In opposition, defendant argues that the factual record before the court demonstrates that

16   the illegal possession of firearms by minors creates serious health and safety risks through both

17   intentional and unintentional shootings.  (Doc. No. 17 at 18.)  This evidence, defendant argues,

18   along with "simple common sense," demonstrates that "a decrease in firearm advertising

19   attractive to minors will alleviate the problem of minors' unsafe use of firearms."  (*Id.*)

20       Although plaintiffs argue that the state legislature conclusion that prohibiting firearms

21   marketing directed at minors would reduce demand for firearms and that this reduction would

22   help protect minors from gun violence is unduly speculative (Doc. No. 13 at 27–28), the court

23   finds that the evidence before it establishes otherwise.  As discussed in the previous section of

24   this order, defendant documented ample evidence showing that there is a substantial problem of

25   firearm-caused deaths among minors.  (Doc. Nos. 17-1 at 40, 48; 17-2 at 75–77.)  Defendant has

26   also cited to studies in the legislative history and in exhibits to counsel's declaration that support

27   the proposition that advertising increases demand among minors for commercial products—

28   including those that minors cannot legally purchase, such as alcohol and tobacco—and that this

1   demand is curtailed through advertising restrictions on those products.  (Doc. Nos. 17-1 at 24; 17-

2   2 at 70.)  These conclusions are bolstered by further evidence provided by defendant that children

3   are generally more susceptible to advertising than adults.  (Doc. No. 17-2 at 70) ("For decades,

4   researchers have recognized children as a vulnerable consumer group because of their budding

5   developmental abilities."); (*id.* at 71) ("Because of the types of appeals used and children's

6   growing cognitive abilities, young people may not be motivated or able to evaluate advertising

7   and make well-informed consumer decisions."); *see also Anheuser-Busch, Inc. v. Schmoke*, 101

8   F.3d 325, 329–30 (4th Cir. 1996) ("[T]he Supreme Court's repeated recognition that children

9   deserve special solicitude in the First Amendment balance because they lack the ability to assess

10  and analyze fully the information presented through commercial media." (collecting cases)).

11        The Senate Judiciary Committee's bill analysis of AB 2571 also included several

12  examples of the types of advertising that the state legislature found problematic, such as

13  advertisements for the "JR-15 . . . a semi-automatic rifle for kids modeled on the AR-15" and

14  marketed by "WEE1 Tactical," a rifle which according to the company's website, "looks, feels,

15  and operates just like Mom and Dad's gun."  (Doc. No. 17-1 at 47); (*see also id.*) (discussing "the

16  Crickett rifle, a gun made for children" whose manufacturer website and brand merchandise made

17  for minors "bear the image of 'Davey Crickett,' a gun-wielding cartoon insect"); *id.* at 48 (noting

18  how there is a "rise of .22-caliber versions of higher-caliber rifles, often produced with

19  lightweight materials" that "bring the coolness and fun of the tactical rifle to kids and less serious

20  shooters").)  Another report appearing in the same bill analysis noted that "[t]he gun industry

21  markets a variety of products explicitly to children . . . from armed stuffed animals to lighter

22  versions of rifles."  (Doc. No. 17-1 at 47.)  These various examples belie plaintiffs repeated

23  contention that there is no link between the marketing of firearms and their demand among

24  minors.  (Doc. No. 13 at 27–28.)  After all, firearm-industry members certainly would not be

25  promulgating minor-targeting advertisements if they did not believe that they were effective.  *See*

26  *Swecker*, 602 F.3d at 590 (finding the link between marketing of alcohol and demand among

27  minors for alcohol was supported by the fact that alcohol vendors wanted to offer such

28  advertisements to underage college students); *Disc. Tobacco City & Lottery, Inc. v. United States*,

22

674 F.3d 509, 539–40 (6th Cir. 2012) ("Though Plaintiffs would have us believe that there is no causal connection between product advertising and the consumer behavior of children, such a claim stretches the bounds of credulity, even in the absence of the extensive record submitted by the government, which indicates the contrary."); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 608 (9th Cir. 2010) ("Common sense counsels that advertising tends to stimulate demand for products and services. Conversely, prohibitions on advertising tend to limit demand."). Notably, plaintiffs do not offer any of their own evidence contradicting the alleged "speculative" and "attenuated" link that they condemn. Not only has defendant offered studies, anecdotes, and common sense supporting the link between advertising and demand among minors, *Fla. Bar*, 515 U.S. at 628, but the Supreme Court has, in several cases, also "acknowledged the theory that product advertising stimulates demand for products, while suppressed advertising may have the opposite effect," *Lorillard Tobacco*, 533 U.S. at 557. Thus, based on the record before it, the court concludes that reducing advertising of firearm-related products that are designed, intended, or reasonably appear attractive to minors would directly and materially advance the state's goals of ensuring that minors do not unlawfully possess dangerous weapons and in protecting its citizens, especially minors, from gun violence. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508–09 (1981) (finding that a legislative judgment that "billboards are traffic hazards" was "not manifestly unreasonable" and that restricting billboards advanced the state's interest in traffic safety despite contentions "that the record [wa]s inadequate to show any connection between billboards and traffic safety").

Lastly, plaintiffs contend that the state "lacks an interest 'in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information.'" (Doc. No. 13 at 28) (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) and citing *Sorrell*, 564 U.S. at 577–78). According to plaintiffs, the Supreme Court has condemned states for attempting to prevent consumers' poor but lawful decisions by denying them truthful commercial information. (*Id.* at 29). This court, however, finds that the decisions in *Thompson* and *Sorrell* are inapposite because both involved blanket bans concerning professional standards targeted at "sophisticated and experienced consumers."

23

1    *Sorrell*, 564 U.S. at 577 (internal quotations omitted).  In contrast, here, § 22949.80 concerns

2    dangerous weapons, has a targeted prohibition that does not implicate most commercial speech

3    regarding lawful activities, *see, e.g.*, California Business & Professions Code § 22949.80(a)(3),

4    and is aimed at restricting speech directed at minors who are the most naïve and novice

5    consumers among us.  *See Schmoke*, 101 F.3d at 329.

6            When compared to advertising restrictions on alcohol and tobacco products, § 22949.80's

7    focus on advertising that is attractive to minors—despite possibly sweeping within its ambit some

8    advertising that may also appeal to adults—almost certainly survives intermediate scrutiny.  *See*

9    *Swecker*, 602 F.3d at 590 (finding that a facial challenge to a ban on alcohol advertising in college

10   newspapers survived intermediate scrutiny even though the ban, which was "*primarily* intended

11   for underage students," also reached "of-age readers," and thus prohibited some lawful activity);

12   *Disc. Tobacco City*, 674 F.3d at 539–40 (upholding restrictions barring, among other things, "the

13   distribution of any non-tobacco item bearing the logo or name of a tobacco brand" and "the

14   sponsorship by a tobacco company of any athletic, musical, artistic, or other social or cultural

15   event" as directly and materially advancing the state's interest in reducing tobacco use by

16   minors); *Eller Media Co. v. City of Oakland*, No. 98-cv-02237 FMS, 1998 WL 549494, at *6

17   (N.D. Cal. Aug. 28, 1998) (upholding an ordinance restricting alcohol advertising because it

18   contained exceptions that were "crafted so as to leave alternative channels available for

19   commercial advertisers while limiting adverting in areas most likely to attract the attention of

20   minors"); *see also Ginsberg v. New York*, 390 U.S. 629, 636–37, 643 (1968) (upholding a

21   prohibition on the sale of pornography to minors and stating that the state may restrict the rights

22   of minors more than adults' rights).

23           Therefore, based on the court's finding that it is likely that a restriction on firearm

24   advertising directed towards minors will lead to a reduction in the demand for firearms by minors,

25   it follows that there will be fewer firearms in the hands of minors, and, as "simple common

26   sense" dictates, fewer instances of gun violence—whether intentional or unintentional—involving

27   minors.  *See United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) ("If there is an

28   immediate connection between advertising and demand, and the federal regulation decreases

advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced.").

Accordingly, the court concludes that plaintiffs have failed to carry their burden of showing a likelihood of success on the merits of their claim that § 22949.80 does not directly and materially advances the state's interest in ensuring that minors do not unlawfully possess firearms and in protecting its citizens, especially minors, from gun violence.  *See Junior Sports Mags.*, 2022 WL 14365026, at *23.

                        iv.        Is § 22949.80 No More Extensive Than Necessary to Serve the Government's Interest?

The fourth, and final, inquiry under *Central Hudson* "requires that a regulation 'is not more extensive than is necessary to serve' a substantial government interest."  *Whiting*, 709 F.3d at 825 (quoting *Central Hudson*, 447 U.S. at 566).  This fourth step "requires a reasonable fit between the means and ends of the regulatory scheme."  *Lorillard Tobacco*, 533 U.S. at 561. "The [Supreme] Court has also clarified *Central Hudson*'s fourth factor by making clear that it does not require satisfaction of a 'least-restrictive-means standard,' but rather requires 'a fit between the legislature's ends and the means chosen to accomplish those ends, [ ]a fit that is not necessarily perfect, but reasonable[,] . . .  a means narrowly tailored to achieve the desired objective."  *Retail Digital Network*, 861 F.3d at 846 (quoting *Fox*, 492 U.S. at 480); *see also Fox*, 492 U.S. at 480 (summarizing the Supreme Court's decisions requiring that the legislature's fit need not represent "the single best disposition but one whose scope is in proportion to the interest served").

A close examination of § 22949.80's circumscribed text demonstrates that the statute satisfies this reasonable fit requirement.  First, the statute prohibits only communications with the primary purpose of encouraging recipients to engage in a commercial transaction regarding "firearm-related products" that are "designed, intended, or reasonably appear[] to be attractive to minors."  Cal. Bus. & Prof. Code § 22949.80(a)(1), (c)(6).  Because minors are prohibited from engaging in commercial transactions involving firearms or ammunition, California Penal Code § 27505(a), § 22949.80 would only reach lawful speech with a primary purpose of proposing a

commercial transaction that is attractive to both minors and adults.  In this regard, § 22949.80 provides a totality of the circumstances test with six enumerated relevant factors that allow courts to ensure, on a case-by-case basis, that § 22949.80 is applied in a constitutionally sound way when "determining whether marketing or advertising of a firearm-related product is attractive to minors."  *Id.* § 22949.80(a)(2); *see Lorillard Tobacco*, 533 U.S. at 563 (noting that, in the context of speech restrictions, "a particular regulatory scheme tends to be case specific" and that "a case specific analysis makes sense . . . [because] the impact of a restriction on speech will undoubtedly vary from place to place").  Those factors—which look at whether the advertising includes, "brand name merchandise *for minors*," "marketing or advertising campaign designed *with intent to appeal to minors*," placement in publications *created to reach* a predominately minor audience "and *not intended for a more general audience composed of adults*"—further limit the statute's application as to advertisements with crossover appeal to adults.  *Id.* § 22949.80(a)(2) (emphasis added).  Moreover, the statute expressly exempts any communications offering or promoting any firearm safety program, hunting safety or promotional program, firearm instructional course, sport shooting event or competition, or any similar program, course, or event, including but not limited to membership in any organization, fundraising events, youth hunting program, or outdoor camp.  *See* Cal. Bus. & Prof. Code § 22949.80(a)(3).  This carve-out further narrows and clarifies § 22949.80's prohibition by explicitly omitting from its scope speech involving the lawful use of firearms by minors.  It also furthers the state's interest in preventing gun violence involving minors, since minors who are educated in the safe handling of firearms, as the exempted programs, courses, and events promote, will be less likely to be involved in unintentional shootings, i.e., gun accidents.

In sum, these features demonstrate that § 22949.80 is carefully crafted—and constitutionally permissible—in contrast to regulations amounting to outright bans that have thus been found to fail *Central Hudson*'s fourth prong.  *See, e.g.*, *Lorillard Tobacco*, 533 U.S. at 561–65 (finding that a regulation prohibiting outdoor tobacco advertising within 1000 feet of schools or playgrounds was not a reasonable fit because it constituted, in some locales, "a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult

consumers"); *Disc. Tobacco City*, 674 F.3d at 548 (holding that "a blanket restriction on color and graphics in tobacco advertising" was not properly tailored); *cf. Swecker*, 602 F.3d at 590–91 (finding the regulation of alcohol advertisements in college newspapers was "not a complete ban" and was narrowly tailored to address the problem of underage and dangerous drinking because the regulation permitted restaurant advertisements to inform readers "about the presence and type of alcohol they serve" and only applied to "college student publications" which as defined did not "affect all possible student publications on campus").

In their pending motion, plaintiffs contend that § 22949.80 should be invalidated because the enforcement of existing laws would serve the identified state interest without burdening speech.  (Doc. No. 13 at 30) (citing *Whiting*, 709 F.3d at 826–27).  Plaintiffs point to the state's existing laws regulating the sale, purchase, and possession of firearms, and contend that the state "could achieve its interest in preventing unlawful sales or transfers to minors by enforcing existing laws and regulations."  (*Id.*)

The court finds that plaintiffs' reliance in this regard on *Whiting* is misplaced.  In *Whiting*, the Ninth Circuit struck down a restriction on day laborers soliciting motorist for employment, finding it "a poor fit with Arizona's interest in traffic safety," in part, because there was no evidence showing that the government's "interest in traffic safety" could not be achieved "by enforcing or enacting similar kinds of speech-neutral traffic safety regulations."  *Whiting*, 709 F.3d at 827.  In reaching that conclusion, the Ninth Circuit considered "actual traffic safety regulations" and "any potential or actual traffic safety regulations that are obviously available." *Id.*  Here, plaintiffs have failed to identify any "obviously available" alternatives that could advance the state's interests in ensuring that minors do not unlawfully possess firearms and in protecting its citizens, especially minors, from gun violence, *that may result from advertising or marketing of firearms directed at minors*.  *See id.* ("The question is therefore not whether existing laws are sufficient to deal with in-street employment solicitation, but rather whether existing laws are sufficient to deal with *the traffic problems* that may attend in-street employment solicitation.").  Although plaintiffs identify one other step the state could take to advance its goals—an educational campaign promoting responsible firearm use among minors—they concede

1  that the state is already engaged in such campaigns regarding hunting licenses.  (Doc. No. 13 at

2  30.)  Moreover, plaintiffs do not offer any evidence supporting the efficacy of the alternative

3  means they propose.  (*Id.*)

4       Accordingly, the court finds that it is likely that § 22949.80 is a reasonable fit for

5  advancing the state's interest in ensuring that minors do not unlawfully possess firearms and in

6  protecting its citizens, especially minors, from gun violence.  *See Junior Sports Mags.*, 2022 WL

7  14365026, at *27–28.  Therefore, for the foregoing reasons, the court concludes that plaintiffs

8  have failed to establish that they are likely to prevail on their facial commercial speech challenge

9  to § 22949.80.

10          2.       Right to Association and Assembly (Claim 3)

11       "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a

12  corresponding right to associate with others."  *Americans for Prosperity Found. v. Bonta*, ___

13  U.S. ___, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609,

14  622 (1984)).  The Supreme Court has "held, for example, that the freedom of association may be

15  violated where a group is required to take in members it does not want, where individuals are

16  punished for their political affiliation, or where members of an organization are denied benefits

17  based on the organization's message."  *Id.* (internal citations omitted).

18       Here, the court finds that plaintiffs' right to associate claim lacks any cognizable basis.

19  Plaintiffs contend that their "associational conduct" is burdened by § 22949.80 because "it

20  prohibits them from advertising or marketing their various firearm-related programs" such that it

21  puts an end to these programs and similar events.  (Doc. No. 13 at 31.)  However, these concerns

22  appear to have been obviated by the AB 160 amendment to § 22949.80.  *See* Cal. Bus. & Prof.

23  Code § 22949.80(a)(3).  Plaintiffs fail to address this provision of the statute, which states that §

24  22949.80's prohibition does not apply to "a communication offering or promoting membership in

25  any organization."  (*Id.*)  Rather, plaintiffs have appeared to abandon this claim altogether by

26  failing to even mention it in their reply brief in support of the pending motion.

27       In addition, as discussed above, the speech prohibited by § 22949.80 constitutes

28  commercial speech, and plaintiffs' fail to cite any case law supporting the proposition that the

1   right to association is implicated in instances involving commercial, rather than political, speech.

2   *See Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1275 (5th Cir. 1979) (noting that "[c]ommercial

3   solicitation is protected only by the commercial speech doctrine, which requires a lower level of

4   scrutiny than required when there is an infringement of the constitutional rights of association and

5   political expression"), *aff'd*, 452 U.S. 89 (1981).  Plaintiffs right to associate claim appears

6   duplicative of their political and ideological right to free speech claim, which the court has

7   already found insufficient in connection with the pending motion due to plaintiffs' failure to

8   demonstrate their likelihood of success on the merits.  *See Junior Sports Mags.*, 2022 WL

9   14365026, at *29 ("The Court concludes that plaintiffs are unlikely to succeed on the merits of

10  their freedom of association claim for the same reasons addressed with respect to plaintiffs'

11  political and ideological free speech claims.")

12          Accordingly, the court concludes that plaintiffs' right to associate is not implicated here

13  and that plaintiffs have failed to demonstrate a likelihood of success on the merits of this claim.

14          3.      Overbreadth (Claim 4)

15          "The First Amendment overbreadth doctrine [] represents a departure from the traditional

16  rule that a person may not challenge a statute on the ground that it might be applied

17  unconstitutionally in circumstances other than those before the court."  *Bates v. State Bar of*

18  *Arizona*, 433 U.S. 350, 380 (1977).  In a facial challenge to a statute's validity under the First

19  Amendment, the "law may be invalidated as overbroad if 'a substantial number of its applications

20  are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *Stevens*, 559

21  U.S. at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6

22  (2008)).  However, "the overbreadth doctrine does not apply to commercial speech."  *Vill. of*

23  *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982) (citing *Central Hudson*,

24  447 U.S. at 565 n.8); *see also Bates*, 433 U.S. at 381 ("Since overbreadth has been described by

25  this Court as 'strong medicine,' which 'has been employed . . . sparingly and only as a last resort,'

26  . . . we decline to apply it to professional advertising, a context where it is not necessary to further

27  its intended objective.").

28  /////

Here, the court has concluded, for the reasons discussed above, that it appears that § 22949.80 addresses only commercial speech, is not intertwined with any non-commercial speech, and that § 22949.80 survives intermediate scrutiny under *Central Hudson*. Accordingly, because the court has found that the only applicable First Amendment challenge is based upon the commercial speech doctrine, and that the statute likely survives this challenge, plaintiffs have failed to demonstrate a likelihood of success on the merits of their First Amendment overbreadth claim. *See Wash. Mercantile Ass'n v. Williams*, 733 F.2d 687, 690 (9th Cir. 1984) (finding that a state statute prohibiting advertisements promoting the sale of drug paraphernalia implicated only commercial speech, and, thus, would not be subject to an overbreadth challenge for that reason) (citing *Stoianoff v. State of Mont.*, 695 F.2d 1214, 1223–24 (9th Cir. 1983)).

### 4.   Void for Vagueness (Claim 5)

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness doctrine reflects two related requirements. First, "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108. Ordinarily, all that is required to satisfy this due process concern is "'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, ___U.S.___, 138 S. Ct. 1204, 1212 (2018). "But where First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required, and courts ask whether language is sufficiently murky that speakers will be compelled to steer too far clear of any forbidden areas." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (internal citations, quotations, and brackets omitted). Second, the vagueness doctrine demands that laws "provide explicit standards for those who apply them" in order to avoid "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. Thus, when a statute's enforcement depends on a "completely subjective standard," it is constitutionally suspect. *Id.* at 113.

Although "vagueness concerns are more acute when a law implicates First Amendment rights," *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001), "perfect clarity and precise guidance have never been required even of regulations that restrict expressive

activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  Rather, "[t]he touchstone of a facial vagueness challenge in the First Amendment context [] is not whether *some* amount of legitimate speech will be chilled; it is whether a *substantial* amount of legitimate speech will be chilled." *Cal. Teachers Ass'n*, 271 F.3d at 1152.  It follows that "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" *Id.* at 1151 (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).  At bottom, facial invalidation of a statute is "strong medicine" that should be employed "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).  Thus, the party seeking facial invalidation, even in the First Amendment context, bears "a heavy burden" in advancing their claim.  *Id.*

Plaintiffs contend § 22949.80 fails to provide both fair notice and a fair enforcement mechanism.  (Doc. Nos. 13 at 17–18; 18 at 3–4.)  In plaintiffs' reply brief, and at the hearing on the pending motion, plaintiffs' counsel made clear that their vagueness argument focuses "primarily on the extreme risk of arbitrary enforcement."  (Doc. No. 18 at 4 n.3.)

First, plaintiffs contend that the statute's definition of "firearm-related product" "encompasses more than just the sale of firearms" because it includes "firearm accessories" and that definition, they argue, is so vague as to include a panoply of products that could have nothing to do with firearms, such as "backpacks, vests, earplugs and safety goggles." (*Id.* at 17.)  The court disagrees with plaintiffs' reading of a "firearm accessory" as it appears in the statute.  Under § 22949.80, "firearm accessory" is specifically defined as "an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with, a firearm which is designed, intended, or functions to alter or enhance the firing capabilities of a firearm, the lethality of the firearm, or a shooter's ability to hold, carry, or use a firearm." Cal. Bus. & Prof. Code § 22949.80(c)(3).  Preliminarily, this definition is limited to "an attachment or device," which according to their common dictionary definitions would not encompass a backpack, vest, earplugs, or safety goggles because those items cannot be affixed to a firearm to perform a

/////

/////

31

1    particular function, nor could those items constitute "mechanical or electronic equipment."[11]  *See*

2    *Arizona All. for Retired Americans v. Hobbs*, No. 22-cv-01374-PHX-GMS, 2022 WL 4465896, at

3    *3 (D. Ariz. Sept. 26, 2022) ("In assessing whether a state statute is unconstitutionally vague,

4    federal courts must look to the plain language of the statute.") (citing *Nunez by Nunez v. City of*

5    *San Diego*, 114 F.3d 935, 941–42 (9th Cir. 1997)).  The phrase "firearm accessory" must also be

6    read in the context of "firearm-related product," which is defined in the statute as "a firearm,

7    ammunition, reloaded ammunition, a firearm precursor part, a firearm component, or a *firearm*

8    *accessory*."  Cal. Bus. & Prof. Code § 22949.80(c)(5) (emphasis added).  Here, the scope of the

9    general term "firearm accessory" is limited by the more specific words listed before it in the

10   definition of "firearm-related product," such as firearm, and a precursor part or component

11   thereof, as well as ammunition or reloaded ammunition.  *See Harrison v. PPG Indus., Inc.*, 446

12   U.S. 578, 588 (1980) ("Under the rule of *ejusdem generis*, where general words follow an

13   enumeration of specific items, the general words are read as applying only to other items akin to

14   those specifically enumerated.").  Thus, plaintiffs reading that "firearm accessory" as it is used in

15   the challenged statute covers a "panoply of [general] products" is clearly in error.  The court

16   therefore finds that § 22949.80's definitions are clear and specific enough to provide fair notice.

17          Second, plaintiffs argue that § 22949.80 "invites arbitrary enforcement and abuse because

18   it requires judges to determine subjectively whether a particular advertisement is 'attractive to

19   minors' based on the 'totality of the circumstances,' including consideration of six *non-exclusive*

20   factors."  (Doc. No. 13 at 17.)  The provision that plaintiffs contend is subjective provides that:

21              [i]n determining whether marketing or advertising of a firearm-
                related product is attractive to minors . . . a court shall consider the
22              totality of the circumstances, including, but not limited to, whether
                the marketing or advertising:
23

24   _____

25   [11]  The Oxford Dictionary defines an "attachment" as "[a]n extra part or extension that is or can
     be attached to something to perform a particular function" and a "device" as "[a] thing made or
26   adapted for a particular purpose, especially a piece of mechanical or electronic equipment."  *See*
     *Attachment*, *Device*, Oxford Dictionaries Online, Oxford University Press,
27   https://premium.oxforddictionaries.com/definition/american_english/attachment and
     https://premium.oxforddictionaries.com/definition/american_english/device (both last accessed
28   Nov. 11, 2022).

(A)   Uses caricatures that *reasonably appear* to be minors or cartoon characters to promote firearm-related products.

(B)   Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals, that promotes a firearm industry member or firearm-related product.

(C)   Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or *appeal* to, minors.

(D)   Is part of a marketing or advertising campaign designed with the intent to *appeal* to minors.

(E)   Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.

(F)   Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

Cal. Bus. & Prof. Code § 22949.80(a)(2) (emphasis added).  Plaintiffs specifically point to the words "reasonably appear" and "appeal" as evidence of this provision's alleged subjectivity. (Doc. Nos. 13 at 17–18; 18 at 3–4.)  Here too, the court disagrees with plaintiffs' contention that § 22949.80 creates an "extreme risk of arbitrary enforcement."  (Doc. No. 18 at 4 n.3.)

As an initial matter, the isolated words—"appeal" and "reasonably appears"—that plaintiffs challenge must be read in the context in which they are used.  *See King*, 576 U.S. at 486.  The word "appeal" is employed in two of the statute's factors:  "firearm-related products in sizes, colors, or designs . . . specifically designed to . . . appeal to, minors"; and "marketing or advertising campaign designed with the intent to appeal to minors."  Cal. Bus. & Prof. Code § 22949.80(a)(2)(C)–(D).  When placed into context, the phrases "specifically designed to appeal" and "designed with the intent to appeal" do not raise legitimate concerns of a completely subjective application because both factors involve deciphering the intent behind the product or advertisement at issue.  *See Flipside*, 455 U.S. at 500–01 (finding that an ordinance regulating "any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs" was not unconstitutionally vague, in part, because it "requires scienter,

/////

/////

33

1    since a retailer could scarcely 'market' items 'for' a particular use without intending that use").[12]

2            Although the phrase "reasonably appears" arguably presents plaintiffs strongest vagueness

3    argument, the court concludes that this language is also not unconstitutionally vague when

4    viewed within the context of the entire statute.  This factor asks whether the marketing or

5    advertising at issue "[u]ses caricatures that reasonably appear to be minors or cartoon characters

6    to promote firearm-related products."  Cal. Bus. & Prof. Code § 22949.80(a)(2)(A).  Importantly,

7    this factor is only triggered under the statute when the hypothetical advertiser decides to use a

8    caricature in their advertisement in the first place.  If no caricatures or cartoon characters are

9    present, then this factor is completely inapplicable.  Thus, there is fair notice as to how one can

10   avoid implicating this portion of § 22949.80.  But assuming for the sake of plaintiffs' argument

11   that a caricature is used in an advertisement, then determining if a particular caricature

12   "reasonably appears" to depict an individual under the age of 18 would amount to a qualitative

13   standard for the court to apply on a case-by-case basis to a real-world advertisement.  Such

14   qualitative standards are not automatically constitutionally problematic; laws regularly require

15   courts to gauge whether certain conduct satisfies qualitative standards on a particular occasion.

16   *See Johnson v. United States*, 576 U.S. 591, 603–04 (2015) ("[W]e do not doubt the

17   constitutionality of laws that call for the application of a qualitative standard such as 'substantial

18   risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his

19   estimating rightly . . . some matter of degree.'") (citation omitted); *see also Kashem v. Barr*, 941

20   F.3d 358, 372–73 (9th Cir. 2019) (holding that although the No-Fly List did not specify the

21   degree of risk inherent in its use of the term "threat," the statute was not unconstitutionally vague

22

23   [12]  Indeed, at the hearing on the pending motion, plaintiffs' counsel conceded that if the statute's
     main provision (§ 22949.80(a)(1)) was limited to outlawing advertisements that were only
24   "designed [or] intended" to be attractive to minors—omitting those that "reasonably appear" to be
     attractive to minors—then the statute would not raise constitutional vagueness concerns.  By
25   plaintiffs' counsel's own reasoning, the two factors employing the word "appeal" would not raise
     constitutional vagueness concerns because they also require determining when the product or
26   advertisement was "designed" or "intended" to appeal to minors.  *See Flipside*, 455 U.S. at 499
     ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness,
27   especially with respect to the adequacy of notice to the complainant that his conduct is
     proscribed.").
28

1    because the "threat assessment required under the No Fly List criteria applies to real-world

2    conduct"). Similarly, here, § 22949.80 would involve applying its one factor regarding

3    caricatures reasonably appearing to be minors to a real-world advertisement containing an actual

4    caricature, not to a hypothetical advertisement in the abstract. *See Johnson*, 576 U.S. at 603–04

5    (distinguishing an unconstitutionally vague clause in the Armed Career Criminal Act that

6    required courts to assess whether a crime posed a "serious potential risk" in a hypothetical

7    "ordinary case" with constitutionally permissible statutes requiring a similar qualitative

8    assessment but to real-world conduct occurring on a particular occasion). Finally, even if

9    plaintiffs argument as to this one factor were found to have some merit, they have hardly shown

10   that it would result in a "substantial" chilling of protected speech, or that it involves more than a

11   mere "uncertainty at [the] statute's margins." *California Teachers Ass'n*, 271 F.3d at 1151–52.

12        Plaintiffs also argue that § 22949.80's test for determining the attractiveness to minors is

13   similar to statutory terms imposing criminal culpability for conduct that is "annoying" or a

14   "breach of the peace," which the Supreme Court has struck down as requiring wholly subjective

15   judgments. (Doc. No. 17 at 18) (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971);

16   *Cox v. State of La.*, 379 U.S. 536, 551–52 (1965)). In contrast to those unconstitutionally vague

17   statutory terms, the enumeration of factors specifically articulated in § 22949.80 provide a more

18   precise meaning of what is "attractive to minors" by identifying the "specific conduct [to] be . . .

19   proscribed." *Grayned*, 408 U.S. at 109 n.3, 113. In turn, this specification guards against a

20   "completely subjective standard" of application and differentiates the phrase "attractive to

21   minors" from phrases such as "annoy" or "breach of the peace," which are "without statutory

22   definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S.

23   285, 306 (2008).

24        Moreover, "[w]hat renders a statute vague is not the possibility that it will sometimes be

25   difficult to determine whether the incriminating fact it establishes has been proved; but rather the

26   indeterminacy of precisely what that fact is." *Id.* Here, the statute does not involve such

27   indeterminacy because the factors, by identifying the specific conduct that is proscribed, invoke

28   "true-or-false determination[s], not [] subjective judgment[s]." *Id.* For example, four of §

1   22949.80(a)(2)'s factors involve a question of fact regarding intent, including whether the

2   marketing or advertising "[o]ffers brand name merchandise *for minors*"; whether it offers

3   "firearm-related products . . . *specifically designed to* be used by, or appeal to, minors"; whether it

4   is "part of a marketing or advertising campaign *designed with the intent* to appeal to minors"; and

5   whether it is "placed in a publication *created for the purpose* of reaching an audience that is

6   predominately composed of minors." Cal. Bus. Prof. Code § 22949.80(a)(2)(B), (C), (D), (E)

7   (emphasis added). The remaining two factors involve questions of fact regarding their mere

8   presence in the marketing or advertising at issue, namely, whether any caricatures or cartoon

9   characters are present, and whether there are any images of minors using firearm-related products

10  present therein. *See id.* § 22949.80(a)(2)(A), (E). Although in the case-by-case application of

11  this statute it may perhaps be difficult to resolve some of these questions of fact, it is not a task

12  unfamiliar to the judicial system. *See Williams*, 553 U.S. at 306 ("But courts and juries every day

13  pass upon knowledge, belief and intent—the state of men's minds—having before them no more

14  than evidence of their words and conduct, from which, in ordinary human experience, mental

15  condition may be inferred.") (quoting *Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 411

16  (1950)). Thus, the court concludes that plaintiffs have failed to show that to the extent there is

17  any uncertainty in § 22949.80's enforcement, this uncertainty renders § 22949.80

18  unconstitutionally vague "in the vast majority of its intended applications."[13] *Cal. Teachers*

19  _____

20  [13] Plaintiffs also rely on an out-of-circuit district court decision for the proposition that a totality
    of the circumstances test does not survive constitutional vagueness challenges. *See Carter v.*

21  *Welles-Bowen Realty, Inc.*, 719 F. Supp. 2d 846, 851–54 (N.D. Ohio 2010), *aff'd*, 736 F.3d 722
    (6th Cir. 2013). In *Carter*, the district court invalidated an agency's policy statement interpreting

22  a provision of the Real Estate Settlement Practices Act (RESPA) by developing a totality of the
    circumstances test to distinguish between "sham" and "*bona fide*" providers of settlement

23  services for purposes of an exception to RESPA's prohibition against kickbacks. *Id.* The court
    has reviewed the decision in *Carter* and finds that the totality of the circumstances test there does

24  not resemble the one before this court because it does not involve "true-or-false determinations"
    of fact like those used in § 22949.80(a)(2)'s factors. *Williams*, 553 U.S. at 306. Nor does the

25  decision in *Carter* stand for the broader proposition that a totality of the circumstances test is
    constitutionally suspect. In fact, another district court that evaluated the same RESPA test did not

26  find that it was unconstitutionally vague, which further limits *Carter*'s persuasive force in this

27  case. *See Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 545 (D. Md. 2011) (declining to
    follow *Carter* and upholding the same ten-factor totality of the circumstances test).

28

1   *Ass'n*, 271 F.3d at 1151.

2         Lastly, plaintiffs contend that the non-exclusivity of the factors used to determine whether

3   an advertisement is "attractive to minors" makes it impossible to know the kinds of

4   advertisements prohibited under § 22949.80.  At the hearing on the pending motion, plaintiffs'

5   counsel presented an example to illustrate this point by displaying an advertisement to the court.

6   The advertisement (Doc. No. 13-12 at 7) was a generic advertisement of a firearm, but plaintiffs

7   posited that it appeared "in a publication created for the purpose of reaching an audience that is

8   predominately composed of minors" and thus implicated one, and only one, factor

9   appearing in § 22949.80(a)(2)'s totality of the circumstances test.[14]  Cal. Bus. & Prof. Code §

10  22949.80(a)(2)(F).  Plaintiffs' counsel contended that the non-exclusivity of the totality of the

11  circumstances test rendered it vague because, he posited, how could a firearm industry member

12  know whether an advertisement implicating only one factor was enough to trigger a violation

13  under the statute.  This is an unpersuasive explication of plaintiffs' vagueness argument.  First,

14  the presence of a single factor in an advertisement would provide fair notice to any would-be

15  advertiser of ordinary intelligence that they are falling within § 22949.80's explicit terms and thus

16  exposing themselves to liability under the statute.[15]  Second, while plaintiffs would like to

17  ────────────────────

18  [14]  The court notes that there is no factual support in the record before it that the publication
which plaintiffs referred to at the hearing was one "created for the purpose of reaching an
audience that is predominately composed of minors and not intended for a more general audience

19  composed of adults."  (*See* Doc. No. 13-8.)  Thus, this example requires the court to speculate
regarding the audience the publication containing the example advertisement was intended to

20  reach.

21  [15]  Moreover, § 22949.80's legislative history strongly suggests that a single factor is enough to
trigger a violation.  For instance, when comparing the specific advertisements discussed in the

22  legislative history that the state legislature found problematic to the text of the totality of the

23  circumstances test, it is obvious that the former served as source material for the drafting of the
latter.  (*Compare, e.g.*, Doc. No. 17-1 at 19, 21–22, 47–48 (noting that a firearm's manufacturer

24  "currently market[s] the weapon . . . with a cartoon skull-and-crossbones with a pacifier") *with*
Cal. Bus. & Prof § 22949.80(a)(2)(A) ("[u]ses . . . cartoon characters to promote firearm-related

25  products"); *see also Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1071 (9th Cir. 2020) ("[W]hen the
language is susceptible of more than one reasonable interpretation, we look to a variety of

26  extrinsic aids, including . . . the legislative history . . . .") (quoting *Nolan v. City of Anaheim*, 33

27  Cal. 4th 335, 340 (2004)); *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098, 1104 (9th
Cir. 2015) (recognizing that "we interpret [California] statutes by applying California's rules of

28  statutory construction").

characterize the non-exclusivity of the totality of the circumstances test for determining what is "attractive to minors" as *carte blanche* for a reviewing court, the statute is properly subject to a more narrow reading when viewed in its context. *See California Teachers Ass'n*, 271 F.3d at 1147 ("[B]efore invalidating a state statute on its face, a federal court must determine whether the statute is 'readily susceptible' to a narrowing construction by the state courts.") (citation omitted). Specifically, § 22949.80's carve-out provision (§ 22949.80(a)(3)), which exempts large swathes of commercial speech from the statute's marketing restriction, dramatically narrows the scope of what can be considered when determining what is "attractive to minors." Indeed, a court cannot rely on any circumstances that would result in prohibiting "a communication offering or promoting" any of the following: "any firearm safety program, hunting safety or promotional program, firearm instruction course, sport shooting event or competition, or any similar program, course or event . . . [or] membership in any organization, or promotion of lawful hunting activity, including, but not limited to any fundraising event, youth hunting program, or outdoor camp." Cal. Bus. & Prof. Code § 22949.80(a)(3). This exemption thus severely limits what can be considered in determining if marketing or advertising is "attractive to minors." Finally, counsel's example does not demonstrate that there is a likelihood that the statute's enforcement would be arbitrary or discriminatory. And, even if it did, "arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute." *Minority Television Project Inc. v. F.C.C.*, 649 F. Supp. 2d 1025, 1047 (N.D. Cal. 2009) (rejecting void for vagueness challenge to FCC regulations of commercial speech, in part, because plaintiff "failed to introduce evidence of FCC enforcement decisions sufficiently inconsistent as to show that the statute is unconstitutionally vague on its face"). Rather, the statute's language allowing circumstances to be considered beyond the specific conduct that is proscribed in the enumerated factors permits "flexibility and reasonable breadth" while still making it "clear what the ordinance as a whole prohibits." *Grayned*, 408 U.S. at 110 (citation omitted); *see also Bushco v. Shurtleff*, 729 F.3d 1294, 1308 (10th Cir. 2013) (reversing the district court's order and holding that the language "intent to engage in sexual activity for a fee may be inferred . . . under the totality of the existing circumstances" was not void for vagueness); *Sec. & Exch. Comm'n v. Miller*, No. 19-cv-02810-

1   DLB, 2022 WL 16575719, at \*7 n.4 (D. Md. Nov. 1, 2022) (rejecting a void for vagueness

2   challenge to a totality of the circumstances test and concluding its common use "across the

3   American legal system to answer a wide variety of fact-specific questions" further undermined

4   the argument that it was vague).

5        In sum, in moving for preliminary injunctive relief, plaintiffs have failed to carry their

6   "heavy burden" in seeking the facial invalidation of § 22949.80 based on their claims of a lack of

7   fair notice or fair enforcement.  This is because neither "uncertainty at a statute's margins,"

8   *California Teachers Ass'n*, 271 F.3d at 1151, nor "speculation about possible vagueness in

9   hypothetical situations not before the Court," *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d

10  990, 1021 (9th Cir. 2010), will warrant facial invalidation "if it is clear what the statute proscribes

11  'in the vast majority of its intended applications.'" *California Teachers Ass'n*, 271 F.3d at 1151

12  (citation omitted); *Brumsickle*, 624 F.3d at 1021.  Accordingly, the court finds that plaintiffs have

13  not established a likelihood of success on the merits with respect to their void for vagueness

14  claim.

15       5.      Equal Protection Clause (Claim 6)

16       "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

17  'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

18  direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v.*

19  *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Because plaintiffs do not contend that being a

20  firearm-industry member is a protected class or that § 22949.80 burdens any fundamental right

21  other than their speech rights, (Doc. No. 13 at 32), plaintiffs' "equal protection claim[] [will] rise

22  and fall with the First Amendment claims." *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th

23  Cir. 2012).  Here, the court has concluded that plaintiffs have not established a likelihood of

24  success on the merits as to any of their First Amendment claims for the reasons discussed above.

25  Accordingly, plaintiffs have also not established a likelihood of success on the merits of their

26  equal protection claim.  *See Junior Sports Mags.*, 2022 WL 14365026, at \*30.

27  /////

28  /////

1    **B.     Irreparable Harm**

2          The risk of irreparable harm must be "likely, not just possible." *All. for the Wild Rockies*,

3    632 F.3d at 1131.  "It is well established that the deprivation of constitutional rights

4    'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

5    Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Roman Cath. Diocese of Brooklyn*

6    *v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for

7    even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod*,

8    427 U.S. at 373).  Having determined that plaintiffs have failed to establish a likelihood of

9    success on the merits of their constitutional challenges to § 22949.80, however, plaintiffs have

10   thus failed to demonstrate that they are likely to suffer irreparable harm if a preliminary

11   injunction does not issue.  *See Junior Sports Mags.*, 2022 WL 14365026, at *30.

12   **C.     Balance of Equities / Public Interest**

13         Courts "must balance the competing claims of injury and must consider the effect on each

14   party of the granting or withholding of the requested relief" and "should pay particular regard for

15   the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

16   at 24.  "In assessing whether the plaintiffs have met this burden, the district court has a duty to

17   balance the interests of all parties and weigh the damage to each." *Stormans*, 586 F.3d at 1138

18   (internal quotation marks and alteration omitted).  "Where the government is a party to a case in

19   which a preliminary injunction is sought, the balance of the equities and public interest factors

20   merge." *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing *Drakes*

21   *Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  "Generally, public interest

22   concerns are implicated when a constitutional right has been violated, because all citizens have a

23   stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

24         Here, the court has not found that it is likely that plaintiffs will prevail on any of their

25   constitutional challenges to § 22949.80 and so it is unlikely the public interest is implicated.  At

26   the same time, the state has a substantial interest in preventing gun violence involving minors and

27   in enforcing its validly enacted statutes.  *See Wiese v. Becerra*, 263 F. Supp. 3d 986, 994 (E.D.

28   Cal. 2017) ("The State has a substantial interest in preventing and limiting gun violence, as well

1    as in enforcing validly enacted statutes.").  Moreover, the relief sought by plaintiffs in the

2    pending motion—enjoining the enforcement of § 22949.80—is identical to the ultimate relief

3    sought in this action, and courts generally disfavor the granting of injunctive relief in such

4    instances.  (*Compare* Doc. No. 13 at 34 *with* Doc. No. 12 at 47); *see also Progressive Democrats*

5    *for Soc. Just. v. Bonta*, No. 4:21-cv-03875-HSG, 2021 WL 6496784, at *11 (N.D. Cal. July 16,

6    2021) ("[C]ourts generally disfavor preliminary injunctive relief that is identical to the ultimate

7    relief sought in the case."); *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1194 (E.D.

8    Cal. 2015) ("Given the seriousness of these issues, it is not in the public interest to impose the

9    extraordinary remedy of a preliminary injunction without further fact finding and more formal

10   guidance."), *aff'd*, 637 F. App'x 401 (9th Cir. 2016).  Accordingly, the court concludes that the

11   balance of equities and consideration of the public interest weighs against the entry of a

12   preliminary injunction in this case.  *See Junior Sports Mags.*, 2022 WL 14365026, at *31.

## CONCLUSION

14        For the reasons explained above, plaintiffs' motion for a preliminary injunction (Doc. No.

15   13) is denied.

16        IT IS SO ORDERED.

17   Dated:   __January 12, 2023__                    _____

18                                                    UNITED STATES DISTRICT JUDGE